Brodia N. Minter (OR Bar #164414)
Klamath Siskiyou Wildlands Center
PO Box 102
Ashland, Oregon
Tel: 541-488-5789
Email: Brodia@kswild.org

*Plaintiff's Attorney*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## MEDFORD DIVISION

**KLAMATH SISKIYOU WILDLANDS CENTER,**
an Oregon non-profit corporation,

    Plaintiff,

  v.

**UNITED STATES DEPARTMENT OF INTERIOR,
BUREAU OF LAND MANAGEMENT**
an agency of the United States of America,

    Defendant.

**Civil Action No.:** 1:19-cv-526

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiff, Klamath Siskiyou Wildlands Center ("KS Wild"), alleges as follows:

2. This is a civil action for declaratory and injunctive relief, arising under the Administrative Procedure Act (APA), 5 U.S.C. §§701 et seq., and alleging violations of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 et seq., and the National Environmental Policy Act (NEPA), 42 U.S.C. §§4321 et seq. and their implementing regulations.

3. Plaintiff Klamath-Siskiyou Wildlands Center (KS Wild) seeks a declaration that Defendant United States Bureau of Land Management (Defendant or BLM) violated federal law by failure to follow requirements for the conversion of District Designated Reserve Timber

COMPLAINT                 1

Production Capability Classification land allocation to the Harvest Land Base Allocation, failing to prepare an adequate environmental analysis addressing the environmental consequences of the Big Graves Timber Sale, and for failure to comply with requirements for protections of sensitive soils on the Grants Pass and Butte Falls Resource Areas of the BLM's Medford District.

4.  Plaintiff additionally seeks injunctive relief to redress the injuries caused by these violations of the law.

5.  By initiating this action, Plaintiff seeks to: 1) obtain a declaration that the BLM improperly relied upon a Categorical Exclusion for the Graves Creek Salvage Project (Graves Creek CX) which authorizes the Big Graves Timber Sale in violation of NEPA, 2) compel the BLM to prepare an adequate environmental analysis for the Graves Creek CX and Big Graves Timber Sale; and 3) enjoin the BLM and its contractors, assignees, and other agents from awarding and implementing the Big Graves Timber Sale contract, or any portion thereof, unless and until this court determines that the violations of law set forth herein have been corrected.

6.  Defendants prepared a Categorical Exclusion, defined as: "[a] category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect ... and for which, therefore, neither an Environmental Assessment nor an Environmental Impact Statement is required," 40 C.F.R. § 1508.4; see also 36 C.F.R. § 215.2 for the Big Graves Timber Sale.

7.  Should Plaintiffs prevail, Plaintiffs will seek an award of costs and attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412.

## JURISDICTION

8.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), 2201 (injunctive relief), and 2202 (declaratory relief). The current cause of action arises under the laws of the United States, including the Administrative Procedure Act (APA), Federal Land Policy Management Act (FLPMA), and National Environmental Policy Act (NEPA). An actual, justiciable controversy exists between Plaintiffs and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

## VENUE

9.  Venue in this court is proper under 28 U.S.C. § 1391 because all of the events or omissions giving rise to the claims herein occurred within this judicial district. The BLM officials who authorized and approved the decision are both headquartered in Medford, Oregon, which is located within this district. Plaintiffs have offices within this district.

10. This case is properly filed in Medford, Oregon pursuant to Local Rules 3.3 and 3.4 because the Big Graves Timber Sale administrators are located in Jackson County, Oregon.

11. Should Plaintiffs prevail, Plaintiffs will seek an award of costs and fees, including attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## PARTIES

12. Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER (KS Wild) is a non-profit organization incorporated in Oregon with an office in Ashland, Oregon. KS Wild has 3,500 members in over 10 states, with most members concentrated in southern Oregon and northern California. KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins, and works to protect and restore the extraordinary biological diversity of the

Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity. KS Wild is a leader in protection Oregon's public lands and routinely participates in commenting, monitoring, and litigation affecting public lands in Oregon, including the BLM's Medford District. KS Wild members use the Big Graves Timber Sale area for a variety of pursuits, including hiking, birding, botanizing, photography, and other personal and professional activities. The interests of KS Wild and its members will be irreparably impaired if the Big Graves Timber Sale is allowed to proceed without compliance with federal environmental laws.

13.  Defendant Jennifer Smith is the Field Manager for the Grants Pass Resource Area on the Medford District of the United States Bureau of Land Management. Defendant Smith is responsible for the management of the Grants Pass Resource Area, where a portion of the challenged Big Graves Timber Sale is located, and approved the Graves Creek Salvage CX by signing the decision notice on December 21, 2018. Defendant Smith also signed the protest decision denying Plaintiffs' administrative challenge to the Big Graves Timber Sale making it ripe for judicial review. She is sued in her official capacity.

14. Defendant Teresa Trulock is the Field Manager for the Butte Falls Resource Area on the Medford District of the United States Bureau of Land Management. Defendant Trulock is responsible for the management of the Butte Falls Resource Area, where a portion of the challenged Big Graves Timber Sale is located, and approved the Graves Creek Salvage CX by

signing the decision notice on December 21, 2018.[1] Defendant Trulock also signed the pro-

test decision denying Plaintiffs' administrative challenge to the Big Graves Timber Sale,

making it ripe for judicial review. She is sued in her official capacity.

15.  Defendant UNITED STATES BUREAU OF LAND MANAGEMENT (BLM) is an agency

of the United States and is a division of the Department of Interior. The BLM is charged with

managing the lands and resources within the Medford District in accordance and compliance

with NEPA, FLPMA, APA, and other federal laws and regulations.


## LEGAL BACKGROUND

### The Federal Land Policy and Management Act

16.  Congress enacted the Federal Land Policy and Management Act (FLPMA) in 1976, in part

"to provide for the management, protection, development, and enhancement of the public

lands." Pub. L. 94-579; see also 43 U.S.C. § 1701 et seq. Congress enacted FLPMA to ensure

that the present and future use of public lands was "projected through a land use planning

process." 43 U.S.C. § 1701(a)(2). Congress also declared as national policy, however, that:

[T]he public lands be managed in a manner that will protect the quality of scientific, scenic,

historical, ecological, environmental, air and atmospheric, water resource, and archaeological

values; that, where appropriate, will preserve and protect certain public lands in their natural

condition; that will provide food and habitat for fish and wildlife and domestic animals; and

that will provide for outdoor recreation and human occupancy and use. . . .43 U.S.C. §

---

[1.]While both Field Managers are identified as the responsible officials for this project in the BLM decision documents, in some instances acting surrogates for the agency provided the physical signatures.

1701(a)(8). 43 U.S.C. § 1701(a)(8). Further underscoring the BLM's duty to protect the environment is the statutory requirement that "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

17.   In FLPMA, Congress declared as a national policy that public lands held by the BLM are to be managed on the basis of multiple use and sustained yield unless otherwise specified by law. 43 U.S.C. § 1701(a)(7); see also 43 U.S.C. § 1732(a) (FLPMA directs BLM to manage public lands "under principles of multiple use and sustained yield.").

18.   To assist in the management of public lands, FLPMA requires that the BLM "develop, maintain, and, when appropriate, revise land use plans." 43 U.S.C. § 1712(a). Congress required that regulations and plans for the protection of public land areas of critical concern be promptly developed. 43 U.S.C. § 1701(a)(11). These land use plans, which the BLM regulations denote "resource management plans" ("RMPs"), see 43 C.F.R. § 1601.0-5(n) (2005), project both the present and future use of the land. 43 U.S.C. § 1701(a)(2). Proposed RMPs are subject to a mandatory period of public notice and comment, see 43 C.F.R. § 1610.2, and, once adopted, will "guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. § 1601.0-2. Among other things, FLPMA prohibits the BLM from taking actions inconsistent with the provisions of RMPs. See *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) ("SUWA"); 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands . . . in accordance with the land use plans developed. . . ."); 43 C.F.R. § 1610.5-3 ("All future resource management authorizations and actions . . . shall conform to the approved plan."). These plans may be amended. 43 C.F.R. § 1610.5-5

19. The Medford BLM adopted its RMP in August of 2016 (2016 Southwest OR RMP).

20. The Defendants Smith and Trulock approved the Big Graves Timber Sale on December 21, 2018.

### The National Environmental Policy Act

21. Congress enacted the National Environmental Policy Act (NEPA) in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). NEPA's disclosure goals are two-fold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to ensure that the public has sufficient information to challenge the agency's action.

22. The Council on Environmental Quality (CEQ) promulgated uniform regulations to implement NEPA that are binding on all federal agencies. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 *et seq*.

23. The regulations implementing NEPA require the BLM to disclose and analyze the environmental effects of the proposed action 40 C.F.R. § 1500.1(b). Specifically, the regulation explains that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id*.

24. The National Environmental Policy Act ("NEPA") "is a procedural statute that does not 'mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'" *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002).

25. Regulations promulgated by the Council on Environmental Quality ("CEQ") provide guidance on the implementation of NEPA. 40 C.F.R. Part 1500. These regulations allow an agency to comply with NEPA in one of three ways. First, the agency may prepare an Environmental Impact Statement ("EIS"). See 40 C.F.R. § 1502. Second, the agency may prepare an Environmental Assessment ("EA") to determine whether the environmental impact of the proposed action is sufficiently significant to warrant an EIS. See 40 C.F.R. §§ 1501.4(b), 1508.9. Third, the agency may determine that the proposed action falls within an established Categorical Exclusion ("CX"). 40 C.F.R. § 1508.4

26. A Categorical Exclusion is defined as "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect ... and for which, therefore, neither an Environmental Assessment nor an Environmental Impact Statement is required." 40 C.F.R. § 1508.4; see also 36 C.F.R. § 215.2

27.  Agencies must adopt procedures that include "specific criteria for and identification of" Categorical Exclusions. 40 C.F.R. § 1507.3

28. The CEQ regulations authorize an agency to use a CX for "actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in [NEPA] procedures adopted by a Federal agency." 40 C.F.R. § 1508.4.

29. There are circumstances in which the application of a CX is inappropriate, however. The agency "shall provide for extraordinary circumstances in which [the] normally excluded action may have a significant environmental effect." Id. To determine whether the proposed action presents extraordinary circumstances, the agency utilizes an internal scoping process.

The scoping process is used to "determine the scope of the issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7

30. "Extraordinary circumstances exist for individual actions within Categorical Exclusions that may meet any of the criteria listed:

    a.  Have significant impacts on public health or safety.

    b.  Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas.

    c.  Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources

    d.  Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

    e.  Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

    f.  Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.

    g.  Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau.

    h.  Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species.

    i.   Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

    j.   Have a disproportionately high and adverse effect on low income or minority populations.

    k.   Limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites.

    l.   Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species." 43 CFR 46.215

31. For an agency's decision to be considered reasonable, a decision record must contain sufficient evidence and analysis to show the decision is reasonably supported by the facts. The agency must show a rational connection between the facts found and the decision rendered. If the agency fails to consider important aspects of the problem in their analysis, its decision is arbitrary and capricious. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010).

### The Administrative Procedure Act

32. The Administrative Procedure Act (APA) confers a right of judicial review on any person that is adversely affected by agency action. 5 U.S.C. §702. Upon review, the court shall "hold unlawful and set aside agency actions...found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. §706(2).

### Factual Background

33. The Big Graves Timber Sale concerns federal actions located in the Grants Pass and Butte Falls Field Offices of the Medford District BLM within the Grave Creek and Evans Creek Watersheds. This project occurs in two Field Offices of the Medford District of the BLM.

34. The Big Graves Timber Sale consists of 250 acres of salvage logging, roadside hazard tree removal, road reconstruction, temporary road construction, and road maintenance within Late Successional Reserves, Riparian Reserves, District Designated Reserve Timber Production Capability Classification Withdrawn[2], and the Harvest Land Base land allocations.

35. During the Federal Government shutdown on December 27, 2018, the BLM published in the *Grants Pass Courier*, the *Medford Mail Tribune*, and the *Coos Bay the World*, four timber sale CXs legal notices authorizing timber sale auctions on January 24, 2019.

36. The timber sale at issue in this action is the Big Graves Timber Sale.

37. On January 7, 2019, KS Wild timely protested the Big Graves Timber Sale, notice published on December 27, 2018, during the federal government shutdown.

38. BLM then delayed the timber sale auctions because of the Federal government shutdown until February 28, 2019.

39. The Big Graves Timber Sale received no bids at auction on February 28, 2019.

40. The Big Graves Timber Sale remains open to bidders through the date of April 28, 2019, at the initially appraised minimum bid value, after which time it may be again offered to qualified bidders at a reduced appraised value by the BLM.

41. Within the 250 acres of authorized post fire logging units, the Big Graves Timber Sale includes 40 acres of District Designated Reserve Timber Production Capability Classification

---

[2] "Withdrawn" refers to the removal of these forest stands from the BLM timber harvest land base by the Resource Management Plan (RMP) due to concerns about fragile soils.

lands withdrawn from the Harvest Land Base allocation in the BLM's 2016 Southwest OR RMP.

42. Table 2 in the NEPA documents for the Big Graves Timber Sale states that both post fire logging units 1 and 4 contain District Designated Reserve Timber Production Capability Classification Withdrawn forest stands to be logged and yarded.

43. It is the BLM District Designated Reserve Timber Production Capability Classification policy to "classify the forest land, and to define and delineate relative suitability or non-suitability for the production of timber on a sustained-yield basis. Partitioning must be site specific based upon physical and biological characteristics and not economic or multiple-use consideration." BLM, The Timber Production Capability Classification Handbook 5252-1 (1986).

44. BLM District Designated Reserve Timber Production Capability Classification policy further outlines the necessary documentation required:

    1. "Documentation. Upon completion of all Field work, information must be clearly displayed on maps or overlays with all acreage figures checked against the master title plant.

       a. In narrative form, document all Technical recommendations. This should include a discussion of those factors which support the recommendation, such as Fragile Site Factors (i.e ), and Reforestation Factors (i.e., moisture and frost). The final classification recommendation must be approved by the Resources Area Manager." *Id*.

45. The Big Graves Timber Sale decision documents contain no information concerning field work pursuant to documenting the transfer of District Designated Reserve Timber Production Capability Classification forests into the Harvest Land Base.

46.  The Big Graves Timber Sale decision documents contain no maps illustrating the acreage figures of District Designated Reserve Timber Production Capability Classification lands vis-a-vis the master title plant.

47.  The Big Graves Timber Sale decision documents contain no technical recommendations or classification recommendations to transfer District Designated Reserve Timber Production Capability Classification lands into the HLB.

48. The Big Graves Timber Sale decision documents fail to include a map or any other form of delineation that identifies sensitive soils presence within the logging units or the location of skid trails and yarding corridors where soils impacts will be most severe.

49. Throughout the planning process, Plaintiff expressed concern about the impacts of proposed post-fire logging on soil resources, reforestation, and fire hazard.

50. On December 17, 2018, Plaintiff submitted a request under the Freedom of Information Act to the BLM OR/WA FOIA office for "All correspondence, notes, emails or other documents regarding the Grave Creek Salvage Project."  On February 4, 2019, Plaintiff received an acknowledgement letter from the BLM OR/WA FOIA office for the FOIA request.

51. On March 27, 2019, Plaintiff received one release of 693 responsive records.

52. The FOIA response contains no information regarding plan maintenance to reallocate 40 acres of District Designated Reserve Timber Production Capability Classification lands to the Harvest Land Base allocation for the Big Graves Timber Sale .

53. Within the Administrative Record for the Big Graves Timber Sale exists a memorandum from the "Oregon State Director for Resource Planning to Western Oregon District Managers, Associate District Managers, District Planning and Environmental Compliance Specialists." The document provides the BLM with "[a] coordinated process for addressing RMP

interpretation and clarification will provide for effective communication across all districts, tracking of issues, and comprehensive responses."

54. BLM timber planners had sought clarification from the BLM state office concerning whether "[s]alvage is appropriate in TPCC-District-Designated-Reserve?" The clarification from the state office indicates that planners should, "[l]imit timber harvest to minimize the potential for the issues identified for the TPCC category – e.g., for FM soils, you would implement the appropriate BMPs (RMP pp. 182-185) that would prevent, "increased dry raveling of soil, losses of soil nutrients, or burying of newly planted seedlings." (RMP p. 205). ...and provide justification in your EA why those BMPs would be appropriate."

55. The BLM produced a Categorical Exclusion for the Big Graves Timber Sale.


**FIRST CLAIM FOR RELIEF (FLPMA Violation)**
**Failure to Comply with FLPMA and RMP Requirements for Plan Maintenance for District Designated Reserve: Timber Production Capability Classification Withdrawn from the Harvest Land Base Allocation**

56.  Plaintiffs incorporate by reference all preceding paragraphs.

57. The 2016 Southwest OR RMP contains several standards and guidelines for the procedure to add and remove lands from the District Designated Reserve Timber Production Capability Classification withdrawn from the Harvest Land Base.

58.  For example, the 2016 Southwest OR RMP defines District Designated Reserve Timber Production Capability Classification as "[t]he process of partitioning forestland within the sustained yield unit into major classes based on the biological and physical capability of the site to support and produce forest products on a sustained yield basis using operational management practices."

59. The 2016 Southwest OR RMP also states, "[o]ver time, the BLM will add additional areas to this allocation through updates to the Timber Production Capability Classification system, when examinations indicate that an area meets the criteria for reservation. The BLM will also delete areas from this allocation and return the area to the Harvest Land Base through updates to the Timber Production Capability Classification system, when examinations indicate that an area does not meet the criteria for reservation. The BLM will implement these additions and deletions to the District-Designated Reserve – Timber Production Capability Classification through plan maintenance, because such changes will represent minor changes based on further refining the decision in the RMP."

60. Plan Maintenance is defined as: **"**[r]esource management plans and supporting components shall be maintained as necessary to reflect minor changes in data. Such maintenance is limited to further refining or documenting a previously approved decision incorporated in the plan. Maintenance shall not result in expansion in the scope of resource uses or restrictions, or change the terms, conditions, and decisions of the approved plan. Maintenance is not considered a plan amendment and shall not require the formal public involvement and interagency coordination process described under §§ 1610.2 and 1610.3 of this title or the preparation of an Environmental Assessment or Environmental Impact Statement. Maintenance shall be documented in plans and supporting records." 43 CFR 1610.5–4.

61. The 2016 Southwest OR RMP requires District Designated Reserve: Timber Production Capability Classification lands information to be kept current "For the District-Designated Reserve – Timber Production Capability Classification, the BLM spatial database includes the current mapped location of this allocation."

62. The BLM has failed to document a "need" to salvage log District Designated Reserve Timber Production Capability Classification lands that were withdrawn from the Harvest Land Base due concerns about the suitability of fragile soils to provide a sustainable-yield of forest products, contrary to the direction of the 2016 Southwest OR RMP.

63. Defendants' decision to implement and proceed with the proposed action that does not comply with the 2016 Medford RMP is arbitrary, capricious, and not in compliance with FLPMA. 5 U.S.C. § 706(2)(A).

64. Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412

### SECOND CLAIM FOR RELIEF
**Failure to Comply with FLPMA and 2016 Southwest OR RMP Requirements for Protections for Sensitive Soils**

65. Plaintiffs incorporate by reference all preceding paragraphs.

66. The 2016 Southwest OR RMP contains several standards and guidelines designed to protect the integrity of soil resources.

67. For example, the 2016 Southwest OR RMP best management practices includes mapping requirements, "[s[oils of concern in the dry forest area include those with a high potential for severe surface erosion, soil creep, periodic slumping (even when not overly saturated), and low nutrient potential. These soils weathered from granite, schist, and pyroclastic materials. The Timber Production Capability Classification (TPCC) and Handbook (5251-1, USDI BLM 1986) involves mapping, with discrete mapping units and interpretations of timbered lands. The classification uses geology, landform, topographic position, climate (especially precipitation), soil properties, and vegetation."

68. The Big Graves Timber Sale decision documents provide no mapping of the District Designated Reserve Timber Production Capability Classification soils of concern in the project area.

69. The 2016 Southwest OR RMP requires the BLM to "[m]anage areas identified as unsuitable for sustained-yield timber production through the Timber Production Capability Classification system, for other uses if those uses are compatible with the reason for which the BLM has reserved these lands (as identified by the Timber Production Capability Classification codes (USDI BLM 1984))."

70. The Administrative Record for the Big Graves Timber Sale acknowledges these District Designated Reserve Timber Production Capability Classification lands were classified as unsuitable for sustain-yield timber production as "woodland" in 1985.

71. The District Designated Reserve Timber Production Capability Classification BLM Handbook defines "Woodland" as: "Land producing trees that are not typically utilized as saw timber products and sold in units other than board feet. Woodlands are those forest lands which are not included in the commercial forest land allowable cut base. These lands can include both commercial forest lands and noncommercial forest lands. Woodland includes lands formerly defined as noncommercial forest lands, and those lands that cannot be reforested within 15 years (now Category I and II lands)." BLM, The Timber Production Capability Classification Handbook 5252-1(1986).

72. The District Designated Reserve Timber Production Capability Classification lands were withdrawn from the harvest land base due to BLM concerns about the ability of those sites to reforest and concerns over nutrient cycling on the rocky serpentine sites that make theses stands unsuitable for sustainable timber production.

73.  Post fire salvage logging is not compatible with the reason these District Designated Reserve Timber Production Capability Classification lands were withdrawn from the Harvest Land Base.

74.  The Graves Creek Timber Sale decision documents content that post-fire logging in District Designated Reserve Timber Production Capability Classification lands is allowable if the concern leading to their removal from the Harvest Land Base would not be exacerbated, and/or if there are pockets within the mapped polygons that do not fit the overall classification on a site-specific basis.

75. Exhibit A of the Sexton Declaration is a peer-reviewed study in which the authors conclude that post-fire salvage logging results in "soils with significantly lower values of a range of ecologically important measures" that that such logging "can have major ecological and functional implications." These findings are relevant to the BLM's logging post-fire proposals on non-Harvest Land Base land use allocations within the Grave Creek Salvage project area.

76. The 2016 Southwest OR RMP directs the BLM to "[a]pply silvicultural or fuels treatments, including prescribed fire, that restore or maintain community-level structural characteristics, promote desired species composition, and emulate ecological conditions produced by historic fire regimes, in areas identified as unsuitable for sustained-yield timber production through the Timber Production Capability Classification system."

77.  The Big Graves Timber Sale authorizes Harvest Land Base logging prescriptions designed to produce timber yields in the District Designated Reserve Timber Production Capability Classification stands rather than prescriptions that restore or maintain community-level structural characteristics, promote desired species composition, and emulate ecological conditions produce by historic fire regimes as required by the 2016 Southwest OR RMP.

78. The Big Graves Timber Sale prescriptions of removing up to 85% of the basal area in District Designated Reserve Timber Production Capability Classification units "may exacerbate" the reason for the reason for District Designated Reserve Timber Production Capability Classification withdrawal.

79. Defendants' decision to implement and proceed with post-fire logging on fragile soils that does not comply with the 2016 Medford RMP is arbitrary, capricious, and not in compliance with FLPMA. 5 U.S.C. § 706(2)(A).

80. Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.


**THIRD CLAIM FOR RELIEF**
**Failure to Prepare an Environmental Assessment (EA) For the Graves Creek Salvage Project when One Should Have Been Prepared**

81. Plaintiffs incorporate by reference all preceding paragraphs.

82. A Categorical Exclusion is "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect ... and for which, therefore, neither an Environmental Assessment nor an Environmental Impact Statement is required." 40 C.F.R. § 1508.4; see also 36 C.F.R. § 215.2.

83. If a proposed action fits within a Categorical Exclusion, detailed NEPA review is not required unless there are "extraordinary circumstances" related to the proposed action. 40 C.F.R. § 1508.4. To determine whether the proposed action presents extraordinary circumstances, the agency utilizes an internal scoping process. The scoping process is used to "determine the scope of the issues to be addressed and for identifying the significant issues related to a proposed action. 40 C.F.R. § 1501.7

84. A Categorical Exclusion, however, is appropriate only when the agency determines that the proposed action does not individually or cumulatively have a significant effect on the human environment. 40 C.F.R. § 1508.4.

85. The Big Graves Timber Sale decision documents fail to adequately consider the extraordinary circumstances for which the action has significant effects on the human environment.

86. The Big Graves Timber Sale decision failed to adequately consider if the proposed action will have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resource; park, recreation, or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (Executive Order 11990); floodplains (Executive Order 11988); national monuments; migratory birds; and other ecologically significant or critical areas.

87. Defendants did not prepare an Environmental Analysis for the Big Graves Timber Sale as recommended by the BLM State Office to act in accordance with the 2016 Southwest OR RMP.

88. The Big Graves Timber Sale decision documents failed to adequately consider if the proposed action will have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources [NEPA Section 102(2)(E)].

89. The Big Graves Timber Sale decision documents failed to adequately consider if the proposed action will have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

90. The Big Graves Timber Sale decision documents failed to adequately consider if the proposed action will establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

91. The Big Graves Timber Sale decision documents failed to adequately consider if the proposed action will establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

92. The Big Graves Timber Sale decision documents failed to adequately consider if the proposed action will violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

93. The Big Graves Timber Sale decision documents failed to adequately consider if the proposed action will contribute to the introduction, continued existence, or spread of noxious weeds or nonnative invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and Executive Order 13751).

94. Defendants' failed to provide a "reasoned" basis for the proposed actions to be taken and therefore is a violation of NEPA.

95. Plaintiffs allege that the presence of extraordinary circumstance prelude a Categorical Exclusion for the Big Graves Timber Sale.

96. Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412

**Plaintiff's Prayer for Relief**

Plaintiffs respectfully request that this Court:

    a.  Declare that the BLM violated Federal Land Policy and Management Act, the National Environmental Policy Act, Administrative Procedure Act, and their implementing regulations in designing, analyzing, and implementing the Big Graves Timber Sale.

    b.   Vacate the Big Grave Timber Sale and DR or order the BLM to:

          i.   Drop all units containing District Designated Reserve Timber Production Capability Classification soils from the Big Graves Timber Sale;

          ii.   Prepare an Environmental Analysis for this project;

    c.   Award Plaintiffs their costs of suit and attorney's fees; and

    d.   Grant Plaintiffs such other and further relief as the Court deems just and equitable.


Respectfully submitted and dated this April 10, 2019

/s/  Brodia N. Minter

Brodia N. Minter OR Bar #164414
Klamath Siskiyou Wildlands Center
PO Box 102
Ashland, Oregon
Tel: 541-488-5789
Email: Brodia@kswild.org

Attorney for Plaintiff
